# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| TAMMY J. WORTHEN,<br><br>  Plaintiff,<br><br>vs.<br><br>GREAT PLAINS NATIONAL BANK, a/k/a<br>GREAT PLAINS BANK,<br><br>  Defendant. | Case No. CIV-17-1334-SLP |

## COMPLAINT

Plaintiff Tammy J. Worthen, ("Plaintiff" or "Worthen") and, for her causes of action against Defendant Great Plains National Bank a/k/a Great Plains Bank, ("Defendant" or "Great Plains"), alleges and states as follows:

### The Parties

1. At all relevant times, Plaintiff was and now is a resident of the City of Hollis, Harmon County, State of Oklahoma.

2. At all relevant times, Defendant was and now is a national banking corporation duly organized and existing under the laws of the United States, and is engaged in operating and conducting banking business in Oklahoma with its principal place of business located in the City of Elk City, Beckham County, State of Oklahoma.

## Jurisdiction and Venue

3. This Court has jurisdiction over the subject matter of this Complaint pursuant to 28 U.S.C. §§ 1343, 42 U.S.C. § 12117, and 42 U.S.C. § 2000e-5.

4. Venue is proper in the Western District of Oklahoma pursuant to 28 U.S.C. § 1391(b) in that a substantial part of the events or omissions giving rise to the claim occurred in Harmon County, Oklahoma, and Beckham County, Oklahoma, which are situated in the Western District of Oklahoma.

## Fact Allegations

5. Plaintiff has been and now is a life-long resident of Hollis, Harmon County, Oklahoma.

6. In her early 20's, Plaintiff started to work as a teller for Defendant's bank located in Hollis, Oklahoma.

7. At the time Plaintiff started her employment with Defendant, Defendant only had one bank location.

8. Over the years, the Defendant developed branch banks in numerous Oklahoma communities including Elk City, Oklahoma, where its headquarters are presently located.

9. As a result of Plaintiff's devotion, hard work, and excellent job performance evaluations, Plaintiff received promotions and in 2012 was named Defendant's Chief Operating Officer. Previously Plaintiff had been named as Executive

Vice-President and was one of two female employees with that designated title out of the three employees in the bank that served as Executive Vice-Presidents.

10. Plaintiff was one of very few females promoted to upper management positions by Defendant.

11. As a result of Plaintiff's dedication and work ethic, Plaintiff expended numerous hours performing her job duties and responsibilities as Chief Operating Officer and Executive Vice-President.

12. Plaintiff and her husband have an adult daughter who is handicapped and has special needs, and as a result of her condition she requires medical attention and home care from time to time.

13. For over twenty (20) years, Plaintiff has been diagnosed with Restless Leg Syndrome ("RLS") and treated for that medical condition by physicians.

14. RLS causes Plaintiff to have a strong urge to move her legs and to have strange and unpleasant feelings in her legs, and caused Plaintiff to have difficulty falling asleep, staying asleep, and experiencing anxiety.

15. As a result of her RLS, Plaintiff started taking medications prescribed by physicians for her disorder.

16. On occasions Plaintiff would experience drowsiness in the work place caused by the RLS sleep deprivation and medication she took to control and manage her RLS.

17. Plaintiff's RLS was well known to the Defendant and because of her RLS Plaintiff's drowsiness was observed and reported by other employees. Plaintiff explained

to Defendant's management that her RLS did occasionally cause her to be drowsy and that she managed it by controlling the timing of when she took her medication.

18. On December 29, 2016, Plaintiff was unable to sleep as a result of her RLS and did not fall asleep until around 3:00 a.m.

19. Later that morning while Plaintiff was at work it was reported by a female employee to upper management that Plaintiff did not come to work until after 10:30 a.m. Plaintiff over-slept due to health and medication issues the night before.

20. Mark Russell ("Russell"), Defendant's President and Chief Executive Officer, and Terry Shelby ("Shelby"), Russell's assistant, and the HR Director summoned Plaintiff to a meeting to talk about Plaintiff's health issues.

21. During this meeting Plaintiff was asked to explain her health problems and what her current medication plan was to address her medical problems.

22. Plaintiff advised Russell, Shelby, and the HR Director of the medications she took, the side effects of the medications that cause drowsiness, and her care and the timing of taking the medications in order to minimize drowsiness.

23. At the conclusion of the meeting, Russell placed Plaintiff on paid administrative leave, told her that they wanted her to get better, and that the leave action taken by Defendant was not disciplinary.

24. Plaintiff was placed on administrative leave for the following three (3) weeks, saw a different physician about her RLS who recommended treatment and prescribed anxiety medications.

25. While Plaintiff was on her three-week paid administrative leave, she kept Defendant's HR Director informed of her health status.

26. Defendant's HR Director instructed Plaintiff to meet with Russell and Shelby at Defendant's home office in Elk City the following day.

27. At that meeting conducted on January 18, 2017, Russell and Shelby told Plaintiff that they interviewed various employees who said both positive and negative things about Plaintiff, and that Defendant made the decision to demote Plaintiff by removing her as Chief Operating Officer, decreasing her salary and benefits by approximately $38,000.00, and placing her under the supervision of the co-worker Plaintiff had previously supervised for several years and who had reported Plaintiff to Russell and Shelby for oversleeping and being drowsy at work.

28. Two weeks before Plaintiff was demoted, she received a bonus for her good job performance, had never received a performance evaluation that was less than meets expectations, and received every performance raise given by Defendant.

29. After three weeks in her demoted position and being subjected to a hostile work environment by her immediate supervisor who Plaintiff had previously supervised, Plaintiff resigned.

30. When Shelby learned of Plaintiff's resignation, he called Plaintiff and asked her to return and raised her salary by $6,000.00 per year to offset the $20,000.00 decrease following Plaintiff's demotion. The conversion project had not been completed and Defendant wanted Plaintiff's expertise to finalize that project.

31. When Plaintiff returned to the work place she learned that bank employees were discussing her health problem in the work place.

32. Plaintiffs' special needs adult daughter had a major surgery at the end of March, 2017, that required Plaintiff to provide care to her daughter at home following her release from the hospital.

33. Plaintiff requested permission to work from home so that she could care for her daughter and did so for one week.

34. At the end of that week, Defendant told Plaintiff she could not work from home even though the custom and policy of Defendant was to allow other employees that accommodation.

35. On or about March 2, 2017, Defendant promoted a male, J.R. Mills, to the position of Chief Operating Officer even though he lacked experience in banking operations. Mills told Plaintiff's co-worker, Beverly Orr, that Russell had indicated that he wanted to remove the Executive Vice-President title from both Plaintiff and Beverly Orr upon Mills' promotion. Mills requested that he leave Plaintiff's and Orr's titles as is.

36. Because of the continued discrimination directed towards Plaintiff because of her RLS and anxiety, and the discriminatory favoritism of male employees over Plaintiff and other females, and her unwarranted demotion and change in work conditions, Plaintiff was constructively discharged by Defendant on April 21, 2017.

37. Plaintiff filed timely her charge of discrimination with the United States Equal Employment Opportunity Commission on October 13, 2017, and the EEOC issued

a Notice of Suit Rights that date. A copy of the Notice of Suit Rights is attached as Exhibit "1" to this complaint and incorporated by reference herein.

## FIRST CAUSE OF ACTION – VIOLATION OF THE AMERICANS WITH DISABILITIES ACT/AMENDMENTS – DISCRIMINATION IN EMPLOYMENT

38. Plaintiff incorporates by reference Paragraphs 1 through 37 as though set forth in full herein.

39. This claim is brought and jurisdiction lies pursuant to the Americans With Disabilities Act/Amendments ("ADAA"), 42 U.S.C. § 12117, which incorporates by reference Section 706 of Title VII of the Civil Rights Act of 1967, as amended, 42 U.S.C. § 2000e-5.

40. Plaintiff is an individual with a "disability" as that term is defined in 42 U.S.C. § 12102(1).

41. Plaintiff is a "person" within the meaning of Section 101(7) of the ADAA, 42 U.S.C. § 12111(7), and Defendant is an "employer" within the meaning set forth in 42 U.S.C. § 12111 (5)(A). Defendant is also a "covered" entity within the meaning of ADAA Section 101(2), 42 U.S.C. § 12111(2).

42. Plaintiff, with reasonable minimal accommodation could perform her job duties as Chief Operating Officer and Executive Vice-President as she had done for

several years during which time she received meets or exceeds job performance job evaluations and performance bonus compensation.

43. Plaintiff had been a qualified individual with a "disability" at all times since her promotion to Chief Operating Officer and Executive Vice-President in 2012 and her demotion on January 18, 2017.

44. Plaintiff's disability was improperly a motivating factor in Defendant's decision to terminate Plaintiff in violation of 42 U.S.C. § 12112(a).

45. As a direct and approximate result of Defendant's aforementioned wrongful conduct, Plaintiff has sustained substantial economic loss including past and future compensation, and other economic benefits. Plaintiff has further sustained loss of financial stability, peace of mind, and future security, and has suffered embarrassment, humiliation, mental anguish and emotional distress and discomfort, and loss enjoyment of life, all to her detriment and damage in an amount in excess of $75,000.00.

WHEREFORE, Plaintiff demands judgment against Defendant:

(1) That judgment be entered declaring that Plaintiff was unlawfully discriminated against by Defendant in violation of the ADAA, as amended;

(2) That Defendant be ordered to make Plaintiff whole by providing back pay and any and all other remedies authorized by the ADAA, as amended, including but not limited to salary and benefits, and accrued interest from the date of her termination until entry of judgment against Defendant and for compensatory damages for

Plaintiff's mental anguish, pain and suffering, and other non-pecuniary losses, including punitive damages allowed by the ADAA;

(3) That Plaintiff be awarded his costs and expenses of this litigation including reasonable attorney's fees and expert witness fees; and,

(4) That Plaintiff be granted such legal and equitable relief as the Court may deem just and proper.

## SECOND CAUSE OF ACTION – VIOLATION OF THE AMERICANS WITH DISABILITIES ACT/AMENDMENTS – REGARDED AS DISABLED

46. Plaintiff incorporates by reference Paragraphs 1 through 45 as though set forth in full herein.

47. Because of Plaintiff's drowsiness on several isolated occasions caused by sleep disruption and medications, and its perception of how her RLS kept Plaintiff from performing her job, Defendant believed that Plaintiff was not physically able to do her job as Chief Operating Officer and Executive Vice-President following her return from administrative leave.

48. Defendant regarded Plaintiff as being disabled to such an extent she could not perform the essential functions of her job as Chief Operating Officer and Executive Vice-President, although she was performing her job duties and functions without being accommodated by taking her medications prescribed by her neurologist she saw during administrative leave to alleviate the drowsiness she sometimes experienced in the work place.

49. As a direct and approximate result of Defendant's aforementioned wrongful conduct, Plaintiff has sustained substantial economic loss including past and future compensation, and other economic benefits. Plaintiff has further sustained loss of financial stability, peace of mind, and future security, and has suffered embarrassment, humiliation, mental anguish and emotional distress and discomfort, and loss enjoyment of life, all to his detriment and damage in an amount in excess of $75,000.00.

WHEREFORE, Plaintiff demands judgment against Defendant:

(1) That judgment be entered declaring that Plaintiff was unlawfully discriminated against by Defendant in violation of the ADAA, as amended;

(2) That Defendant be ordered to make Plaintiff whole by providing back pay and any and all other remedies authorized by the ADAA, as amended, including but not limited to salary and benefits, and accrued interest from the date of her termination until entry of judgment against Defendant and for compensatory damages for Plaintiff's mental anguish, pain and suffering, and other non-pecuniary losses, including punitive damages allowed by the ADAA;

(3) That Plaintiff be awarded his costs and expenses of this litigation including reasonable attorney's fees and expert witness fees; and,

(4) That Plaintiff be granted such legal and equitable relief as the Court may deem just and proper.

Dated this 13th day of December, 2017.

          WARD & GLASS, L.L.P.

          /s/ Stanley M. Ward
          Stanley M. Ward, OBA#9351
          Woodrow K. Glass, OBA#15690
          R. Ben Houston, OBA#14751
          Barrett T. Bowers, OBA#30493

Brent L. Neighbors, OBA#15910
1601 36th Avenue, N.W.
Norman, Oklahoma 73072
(405) 360-9700 / Fax (405) 360-7902
**ATTORNEYS FOR PLAINTIFF**

**JURY TRIAL DEMANDED**
**ATTORNEYS' LIEN CLAIMED**